**GHISELLI BROS., Inc., Plaintiff**

**v.**

**RYAN Inc. and AMERIKA SAMOA BANK, Defendants**

High Court of American Samoa
Trial Division

CA No. 103-89

June 4, 1991

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, John L. Ward II
 For Defendant Ryan Inc., Roy J.D. Hall, Jr.
 For Defendant Amerika Samoa Bank, William H. Reardon

On Motion for Summary Judgment:

Plaintiff Ghiselli Bros., an export company doing business in California, sold a container full of meat products "c.i.f." to defendant Ryan Inc. in American Samoa. The two companies had done business on similar terms before.

Upon shipping the goods to American Samoa, plaintiff Ghiselli Bros. transmitted to defendant Amerika Samoa Bank a foreign collection letter and sight draft in the amount of $44,033.38, together with the bill of lading for the shipment and a certificate of insurance made payable to Ryan Inc.. The transmission was through plaintiff's bank in California, Bank of the West. According to the terms of the foreign collection letter, the Amerika Samoa Bank (hereinafter "the Bank") was to release the documents to Ryan Inc. only upon receiving full payment. The collection letter further provided that the collection was "subject to the current uniform rules for collection of commercial paper issued by the International Chamber of Commerce" and that if its terms were unacceptable to the Bank, the Bank should notify Bank of the West immediately.

The shipment arrived in American Samoa on November 6, 1988. However, Ryan Inc. did not then have the money to pay for the shipment. With the acquiescence of plaintiff, Ryan Inc. arranged for the container to remain on the dock, with the refrigerated container plugged into a power supply there.

On January 19, 1989, the chief executive officer of Ryan presented the Bank a check in the amount of $50,114.05, the total amount of the sight draft and of another invoice from Ghiselli. The check was drawn on Ryan's account at the Bank. The Bank accepted the

129

check and surrendered the bill of lading and insurance certificate to Ryan.

The Ryan executive then went to the offices of the shipping company, presented the bill of lading, and was given access to the container. Upon opening the container he found that its contents were spoiled. He then called the Bank and ordered that payment be stopped on his check. Although it was at least two hours after the Bank's closing time, the Bank immediately issued a stop order. The next morning Ryan returned the bill of lading and insurance certificate to the Bank. Ryan's account was never charged for the amount of the check.

The Bank kept the bill of lading and insurance certificate. It did not provide notice of dishonor to the Bank of the West or to Ghiselli. Ghiselli appears to have found out within a few days that the documents had been given to Ryan but that neither Ryan nor the Bank intended to forward any funds to Ghiselli.

Ghiselli and Ryan have filed motions for summary judgment. In a memorandum answering Ghiselli's motion, the Bank also requests summary judgment in its favor. The facts stated above are undisputed. The only important factual dispute is about how the goods were damaged. Plaintiff Ghiselli says they were damaged on the dock, possibly because Ryan ordered the port authorities to turn the electricity on and off on alternate days. Ryan denies giving any such order and suggests that the goods may have been damaged while still on the ship.

Because the goods were shipped c.i.f., this factual dispute is not material to the case before us. Under the terms of a c.i.f. contract, the seller pays for shipping costs and also for an insurance policy that will protect the buyer against damage during shipping. The title and the risk of loss or damage to the goods shift to the buyer upon delivery of the goods to the carrier and of the bill of lading and the insurance certificate to the buyer. *See* U.C.C. § 2-401; R. Nordstrom & N. Lattin, Sales & Secured Transactions 265 (1968). If, as Ryan contends, the goods were damaged in transit because of a faulty refrigerated container, Ryan's remedy was to file a claim under the insurance policy purchased by the seller and surrendered to Ryan by the Bank upon presentation of Ryan's check. Contrary to Ryan's assertions, damage in transit would not give the buyer a right to reject the goods as "non-conforming." Indeed, the substitution of the insurance policy for a buyer's right to reject goods damaged in transit (or to refuse to pay for goods lost in transit) is the whole point of a c.i.f. contract.

Under a c.i.f. contract the seller receives a purchase price payable as the parties agree and for that consideration is bound to arrange for the carriage of the goods to their agreed destination, for insurance upon them for the benefit of the buyer, and either to pay the cost of the carriage and insurance or allow it on the purchase price. When this has been done the seller has fully performed and is entitled to be paid upon delivery of the documents to the buyer regardless of whether the goods themselves have arrived at their destination or ever will.

*Warner Bros. & Co., Ltd. v. Israel*, 101 F.2d 59, 60 (2d Cir. 1939).

Because plaintiff Ghiselli Bros. prevails as a matter of law even on defendant Ryan's version of the facts, plaintiff is entitled to summary judgment against Ryan.

The dispute between Ghiselli Bros. and the Bank is slightly more complicated. The Bank argues that it became obligated to transmit the funds to Ghiselli only after it had been "paid," and that the Bank was never "paid" because Ryan stopped payment on its check before the Bank had executed some of the steps necessary to render the check "paid."

The Court confesses to some skepticism about the Bank's assertion that checks are not "paid" until late in the evening on the day they are presented and that in accordance with "modern banking practices" the drawer has an absolute right to stop payment up to that time. If this is true even when the check has been negotiated for documents evidencing title, it would logically seem also to be true when the check has been cashed. If the bank had given the Ryan executive $44,000 of its own money in exchange for the check, we find it difficult to imagine that it would have obeyed the executive's after-hours instructions to stop payment, even if he had also promised to come by the next morning and pay back the money. The answer to such instructions would presumably be that the check had already been paid. If the Bank can deem a check paid the instant it surrenders its money, it is difficult to understand why Ghiselli's documents could not have been given the same consideration.

For the purpose of Ghiselli's motion for summary judgment against the Bank, however, we must accept as true the Bank's statements about what is entailed by modern banking practices. These statements

131

are to the effect that the Bank, under its contract with its account-holder Ryan Inc., was obliged to stop payment on the check, even though it had been negotiated for the title documents. The Bank concludes that it never became liable to forward any funds to Ghiselli, because Ryan's stop-payment order had the effect of causing the sight draft never to have been paid.

Even if true, this is beside the point. Ghiselli does not sue the Bank on the Bank's contract with its account-holder Ryan. Rather, it sues on a separate and distinct contract between Ghiselli and the Bank. The terms of this contract were clear: the Bank was to surrender the title documents only upon payment. According to the International Chamber of Commerce rules incorporated by reference in the contract, "the collecting bank must . . . only release the documents to the drawee against payment in local currency which is immediately available for disposal in the manner specified in the collection order." Upon receiving payment, the Bank was to remit $44,033.38 to Bank of the West for transmission to Ghiselli. Although these terms were set forth in documents provided by Ghiselli and not signed by any Bank officer, they were the standard terms of a standard banking transaction, and the Bank was free to reject them by so advising Bank of the West.

Instead, the Bank surrendered the documents to Ryan. Even if the Bank cannot be deemed previously to have accepted the proffered contract to become a collection agent for Ghiselli, this act was certainly an acceptance. This same act, assuming the correctness of the Bank's contention about its obligations to Ryan, was also a breach of the contract with Ghiselli. By accepting something other than local currency --- something which the Bank now says was not as good as currency, in that it was *not* immediately available to be transmitted to Bank of the West as required by the sight draft and collection letter --- in exchange for the title documents, the Bank varied the terms of its performance under the contract. It thereby obligated itself to make good any difference between the effect of what it did and the effect of what it had contracted to do. By doing an act which its contract with Ghiselli authorized it to do only when the sight draft had been "paid," the Bank undertook as between itself and Ghiselli that the draft had in fact been paid.

Ghiselli is therefore entitled to summary judgment against the Bank.

We express no opinion concerning the rights and liabilities between Ryan and the Bank. Each claims a right of indemnity against

the other. Ryan has not advanced a plausible basis for the imposition of such indemnity against the Bank, and the Bank does not appear to have moved for summary judgment against Ryan.

Although plaintiff Ghiselli requests an award of attorney fees, it advances no contractual or legal basis for such an award.

Accordingly, judgment will enter in favor of plaintiff Ghiselli Bros., Inc., and against defendants Ryan Inc. and Amerika Samoa Bank jointly and severally, in the amount of $44,033.38.

It is so ordered.